UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | |
|---|---|
| - versus - | MEMORANDUM AND ORDER<br>12-CR-763 |
| HSBC BANK USA, N.A. AND HSBC HOLDINGS PLC,<br>                       Defendants. | |

JOHN GLEESON, United States District Judge:

       On December 11, 2012 the government filed an Information charging HSBC Bank USA, N.A. ("HSBC Bank USA") with violations of the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et. seq.*, including, *inter alia*, willfully failing to maintain an effective anti-money laundering ("AML") program. *See* Information, ECF No. 3-1. The Information also charges HSBC Holdings plc ("HSBC Holdings") with willfully facilitating financial transactions on behalf of sanctioned entities in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1702 & 1705, and the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 3, 5, 16. *See id*.

       On the same day the government filed the Information, it also filed a Deferred Prosecution Agreement ("DPA"), a Statement of Facts, and a Corporate Compliance Monitor agreement. The government filed these documents as exhibits to a letter application requesting that the Court hold the case in abeyance for five years in accordance with the terms of the DPA and exclude that time pursuant to 18 U.S.C. § 3161(h)(2) from the 70-day period within which trial must otherwise commence.[1] Gov't Letter, Dec. 11, 2012, ECF No. 3. The DPA provides

---

[1] HSBC Bank USA and HSBC Holdings joined in the government's application.

that if HSBC Bank USA and HSBC Holdings (collectively, "HSBC") comply with its terms and provisions, the government will seek to dismiss the Information after five years.

On December 20, 2012 the parties appeared before the Court for a status conference. At the conference, I indicated that this Court has authority to accept or reject the DPA pursuant to Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 11(c)(1)(A) and United States Sentencing Guideline ("U.S.S.G.") § 6B1.2.[2] Accordingly, I inquired as to whether, under the rubric of U.S.S.G. § 6B1.2, the DPA adequately reflects the seriousness of the offense behavior and why accepting the DPA would yield a result consistent with the goals of our federal sentencing scheme. I granted the parties leave to respond to these queries in writing.

For the reasons set forth herein, I approve the DPA pursuant to the Court's supervisory power and grant the parties' application to place the case in abeyance for five years pursuant to the Speedy Trial Act. The Court will maintain supervisory power over the implementation of the DPA and directs the government to file quarterly reports with the Court while the case is pending.

A.  *The Authority of the Court*

    1.  *Fed. R. Crim. P. 11(c)(1)(A) and U.S.S.G. § 6B1.2*

In their written submissions to the Court, the parties contest the applicability of Fed. R. Crim. P. 11(c)(1)(A) and U.S.S.G. § 6B1.2 to the DPA.[3] Gov't Mem. in Supp. DPA 2 n.1, ECF No. 14; Defs.' Letter in Supp. DPA 1-2, ECF No. 15. The parties assert that these provisions apply to cases where a defendant pleads guilty or *nolo contendere* to a charged (or lesser-included) offense and the plea agreement provides that the government will not bring, or

---

[2] The parties expressed their agreement with this characterization of the Court's authority at the status conference. Dec. 20, 2012 Tr. 5:20-6:17.

[3] The government nevertheless addresses why the DPA adequately reflects the seriousness of the offense behavior and why accepting the DPA would yield a result consistent with the goals of our federal sentencing scheme. Gov't Mem. in Supp. DPA 2 n.1.

will move to dismiss, other criminal charges. Gov't Mem. in Supp. DPA 2 n.1; Defs.' Letter in Supp. DPA 2. They submit that this scenario is not presently before the Court because HSBC has not agreed to plead guilty. Rather, HSBC has entered into an agreement to defer prosecution, whereby the government agrees to dismiss the Information if HSBC complies with the terms and provisions of the DPA. Gov't Mem. in Supp. DPA 2 n.1; Defs.' Letter in Supp. DPA 2.

The parties have a sound textual basis for their position. Fed. R. Crim. P. 11(c)(1)(A) states:

> **(c)** **Plea Agreement Procedure.**
>
> **(1)** **In General.** An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty or *nolo contendere* to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:
>
> **(A)** not bring, or will move to dismiss, other charges

The parties have not reached a plea agreement within the meaning of Fed. R. Civ. P. 11(c)(1)(A). HSBC has not agreed to plead guilty or *nolo contendere* to any of the charged offenses; it entered pleas of not guilty at the arraignment and expects that the charges will eventually be dismissed. Minute Entry, Dec. 20, 2012, ECF No. 13. Nor has the government agreed to dismiss other charges in exchange for a plea of guilty. Accordingly, neither Fed. R. Crim. P. 11(c)(1)(A) nor U.S.S.G. § 6B1.2 is applicable here.[4]

---

[4] U.S.S.G. Chapter Six, Section B sets forth "[p]olicy statements governing the acceptance of plea agreements under Rule 11(c), Fed. R. Crim. P. . . . to ensure that plea negotiation practices (1) promote the statutory purposes of sentencing prescribed in 18 U.S.C. § 3553(a); and (2) do not perpetuate unwarranted sentencing disparity." U.S. SENTENCING GUIDELINES MANUAL ch. 6, pt. B, introductory cmt. (2012). Since the parties have

2. *The Speedy Trial Act*

The parties assert that 18 U.S.C. § 3161(h)(2) of the Speedy Trial Act "provides the applicable legal standard for the Court's review, as it requires the Court's approval for the exclusion of time." Defs.' Letter in Supp. DPA 2; *see also* Gov't Mem. in Supp. DPA 2 n. 1 ("In connection with a DPA, once a defendant has made an appearance and the speedy trial clock has begun to run, as it has here, the Court has the authority to determine whether to grant or deny a speedy trial waiver . . . ."). Pursuant to 18 U.S.C. § 3161(h)(2), "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct" "shall be excluded . . . in computing the time within which the trial of any such offense must commence." As HSBC observes, "subsection (h)(2) does not itself set forth a standard for the exclusion of time in the deferred prosecution context." Defs.' Letter in Supp. DPA 2. HSBC argues, however, that "subsection (h)(7), the Act's catch-all provision, provides that time should be excluded if the interests of justice served by the exclusion outweigh the best interests of the defendant and the public in a speedy trial." *Id*. (citing 18 U.S.C. § 3161(h)(7)).

I disagree with HSBC's assertion that the standard for excluding time pursuant to 18 U.S.C. § 3161(h)(2) is the ends-of-justice balancing inquiry articulated by 18 U.S.C. § 3161(h)(7). In *Zedner v. United States*, the Supreme Court explained:

> [T]he [Speedy Trial] Act recognizes that criminal cases vary widely and that there are valid reasons for greater delay in particular cases. To provide the necessary flexibility, the Act includes a long and detailed list of periods of delay that are excluded in computing the time within which trial must start. See

---

neither engaged in plea discussions nor entered a plea agreement, U.S.S.G. § 6B1.2, which articulates "Standards for Acceptance of Plea Agreements," is similarly inapplicable.

> § 3161(h). For example, the Act excludes "delay resulting from other proceedings concerning the defendant," § 3161(h)([1]), "delay resulting from the absence or unavailability of the defendant or an essential witness," § 3161(h)(3)(A), "delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial," § 3161(h)(4), and "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted," § 3161(h)([6]).
>
> Much of the Act's flexibility is furnished by § 3161(h)([7]), which governs ends-of-justice continuances . . . . This provision permits a district court to grant a continuance and to exclude the resulting delay if the court, after considering certain factors, makes on-the-record findings that the ends of justice served by granting the continuance outweigh the public's and defendant's interests in a speedy trial. This provision gives the district court discretion – within limits and subject to specific procedures – to accommodate limited delays for case-specific needs.

547 U.S. 489, 497-99 (2006). The Court's interpretation makes clear that 18 U.S.C. § 3161(h)(7) is not a "catch-all provision;" rather, it describes one specific type of exclusion – *i.e.*, when the ends of justice served by the exclusion outweigh the best interests of the public – permitted by the Speedy Trial Act.[5] This interpretation accords with a straightforward reading of the provision, which nowhere suggests that this balancing inquiry applies to the myriad other types of exclusion enumerated in 18 U.S.C. § 3161(h).

Returning then to 18 U.S.C. § 3161(h)(2), the exclusion applies to that "delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." Thus, under a plain reading of this provision, a court is to exclude the delay occasioned by a deferred prosecution agreement, but only upon

---

[5] 18 U.S.C. § 3161(h)(7) does operate as a "catch-all provision" in the sense that "[t]he exclusion of delay resulting from an ends-of-justice continuance is the most open-ended type of exclusion recognized under the Act." *Zedner*, 547 U.S. at 508. Indeed, the parties could have chosen to request the exclusion of delay on ends-of-justice grounds in addition to or in lieu of the 18 U.S.C. § 3161(h)(2) exclusion.

5

approval of the agreement by the court. This interpretation is buttressed by the legislative history of the provision. The Report of the Senate Judiciary Committee on the Speedy Trial Act states that this provision "assures that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid the speedy trial time limits." S. REP. NO. 93-1021, at 37 (1974).

The Speedy Trial Act is silent as to the standard the court should employ when evaluating whether to grant "approval" to a deferred prosecution agreement under 18 U.S.C. § 3161(h)(2). Case law on this point is barren both in the Second Circuit and in other Circuits. However, the Report of the Senate Judiciary Committee suggests that such approval is grounded in a concern, to put it bluntly, that parties will collude to circumvent the speedy trial clock. S. REP. NO. 93-1021, at 37. 18 U.S.C. § 3161(h)(2) appears to instruct courts to consider whether a deferred prosecution agreement is truly about diversion and not simply a vehicle for fending off a looming trial date.

The DPA at issue here is, without a doubt, about diverting HSBC from criminal prosecution. But approving the exclusion of delay during the deferral of prosecution is not synonymous with approving the deferral of prosecution itself. As I discuss in greater detail below, the parties erroneously assume that the Court lacks authority to consider the latter question, and therefore need only decide the former. They are wrong. As such, the question of whether to exclude the duration of the DPA from the speedy trial clock hinges on a determination of whether the Court approves the DPA.

3. *The Court's Supervisory Power*

This Court has authority to approve or reject the DPA pursuant to its supervisory power. "The supervisory power . . . permits federal courts to supervise 'the administration of

6

criminal justice' among the parties before the bar." *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (quoting *McNabb v. United States*, 318 U.S. 332, 340 (1943)); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring) ("[E]very United States court has an inherent supervisory authority over the proceedings conducted before it . . . ."). The courts have wielded this authority substantively, that is, to provide a remedy for the violation of a recognized right of a criminal defendant. *See McNabb*, 318 U.S. at 345 (holding that "a conviction resting on evidence secured through . . . a flagrant disregard of the procedure which Congress has commanded [then 18 U.S.C. § 595, now Fed. R. Crim. P. 5(a)(1)] cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law"); *see also United States v. Hasting*, 461 U.S. 499, 505 (1983) (recognizing the "implement[ation of] a remedy for violation of recognized rights" as one of the proper uses of the supervisory power). They have also wielded this authority to fashion "civilized standards of procedure and evidence" applicable to federal criminal proceedings. *McNabb*, 318 U.S. at 340; *see, e.g.*, *McCarthy v. United States*, 394 U.S. 459 (1969) (establishing procedure for accepting guilty plea); *Elkins v. United States*, 364 U.S. 206 (1960) (overruling "silver platter" doctrine, which permitted federal courts to receive evidence illegally seized by state officials without the involvement of federal officials); *Ballard v. United States*, 329 U.S. 187 (1946) (holding that jurors must be selected from fair cross-section of community).

One of the primary purposes of the supervisory power is to protect the integrity of judicial proceedings. *Hasting*, 461 U.S. at 526 ("[Our] cases have acknowledged the duty of reviewing courts to preserve the integrity of the judicial process."); *Payner*, 447 U.S. at 735 n.8 ("[T]he supervisory power serves the 'twofold' purpose of deterring illegality and protecting judicial integrity."); *Elkins*, 364 U.S. at 216, 222-23 (discussing "the imperative of judicial

7

integrity" in invoking the supervisory power). Justice Louis Brandeis eloquently articulated this distinct duty to uphold judicial integrity:

> The governing principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands. The maxim of unclean hands comes from courts of equity. But the principle prevails also in courts of law. Its common application is in civil actions between private parties. Where the government is the actor, the reasons for applying it are even more persuasive. Where the remedies invoked are those of the criminal law, the reasons are compelling.
>
> . . . The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. . . . It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. . . . The court protects itself.

*Olmstead v. United States*, 277 U.S. 438, 483-85 (1928) (Brandeis, J., dissenting), overruled by *Katz v. United States*, 389 U.S. 347 (1967), and *Berger v. New York*, 388 U.S. 41 (1967). Justice Brandeis's words have since resonated throughout the Supreme Court's supervisory power jurisprudence. *See Elkins*, 364 U.S. at 223 (stating that federal courts will not be "accomplices in the willful disobedience of a Constitution they are sworn to uphold"); *Mesarosh v. United States*, 352 U.S. 1, 14 (1956) ("This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted."); *McNabb*, 318 U.S. at 347 ("We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement.").

Both parties assert that the Court lacks any inherent authority over the approval or implementation of the DPA. They argue that the Court's authority is limited to deciding, in the present, whether to invoke an exclusion of time under the Speedy Trial Act and, in the distant

future, whether to dismiss the charges against HSBC. Gov't Mem. in Supp. DPA 2 n.1; Defs.' Letter in Supp. DPA 2. I conclude that the Court's authority in this setting is not nearly as cabined as the parties contend it is.

The government has absolute discretion to decide not to prosecute. *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review."). Even a formal, written agreement to that effect, which is often referred to as a "non-prosecution agreement," is not the business of the courts.[6] In addition, the government has near-absolute power under Fed. R. Crim. P. 48(a) to extinguish a case that it has brought. *See United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991) ("Rule 48(a) provides that prosecutors may, 'by leave of court,' file a dismissal of an indictment, information or complaint. A court is generally required to grant a prosecutor's Rule 48(a) motion unless dismissal is 'clearly contrary to manifest public interest.'"). In my view, if the government were now moving to dismiss this case, it would be an abuse of discretion to deny that motion.

The government has chosen neither of those paths. Rather, it has built into the DPA with HSBC a criminal prosecution that will remain pending (assuming all goes well) for at least five years. DPA ¶ 3, ECF No. 3-2. Just as a non-prosecution agreement is perceived as a public relations benefit to a company,[7] perhaps the filing and maintenance of criminal charges

---

[6] *See* Memorandum from Craig S. Morford, Acting Deputy Att'y Gen., U.S. Dep't of Justice, to Heads of Department Components, U.S. Att'ys re: Selection and Use of Monitors in Deferred Prosecution Agreements and Non-Prosecution Agreements with Corporations (Mar. 7, 2008), *available at* http://www.justice.gov/dag/morford-useofmonitorsmemo-03072008.pdf (last visited June 28, 2013) ("In the non-prosecution agreement context, formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court.").

[7] The major distinction between a deferred prosecution agreement and a non-prosecution agreement appears to be the stigma associated with the former (*i.e.*, filing a criminal charge). *See* Peter J. Henning, *The Organizational Guidelines: R.I.P.?*, 116 YALE L.J. POCKET PART 312, 314 n.9 (2007), http://yalelawjournal.org/images/pdfs/528.pdf ("A deferred prosecution agreement involves the filing of criminal charges that will be dismissed after an agreed term so long as the company fulfills all the requirements of the agreement. A non-

was intended to produce a public relations benefit for the government.[8] But for whatever reason or reasons, the contracting parties have chosen to implicate the Court in their resolution of this matter. There is nothing wrong with that, but a pending federal criminal case is not window dressing. Nor is the Court, to borrow a famous phrase, a potted plant.[9] By placing a criminal matter on the docket of a federal court, the parties have subjected their DPA to the legitimate exercise of that court's authority.

The courts "are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement." *McNabb*, 318 U.S. at 347. The inherent supervisory power serves to ensure that the courts do not lend a judicial imprimatur to any aspect of a criminal proceeding that smacks of lawlessness or impropriety. "The court protects itself." *Olmstead*, 277 U.S. at 485. The parties have asked the Court to lend precisely such a judicial imprimatur to the DPA, by arranging for its implementation within the confines of a pending case. The Court will therefore exercise its supervisory authority over the DPA.

I recognize that the exercise of supervisory power in this context is novel. In the typical supervisory power case, the defendant raises a purported impropriety in the federal criminal proceeding and seeks the court's redress of that impropriety. *See United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000) ("[G]enerally the exercise of supervisory power arises in the context of requests by defendants to vacate convictions, dismiss indictments, or invalidate

---

prosecution agreement is similar except that the charges are not filed, thus giving a small public relations benefit to the company, which can truthfully assert it was never prosecuted for the misconduct.").

[8] On the day that the government filed the Information and DPA in this case, it issued a press release, in which the United States Attorney for the Eastern District of New York, Loretta E. Lynch, stated: "Today we announce the filing of criminal charges against HSBC, one of the largest financial institutions in the world. . . . Today's historic agreement, which imposes the largest penalty in any BSA prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions." Press Release, U.S. Dep't of Justice, HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement (Dec. 11, 2012), *available at* http://www.justice.gov/opa/pr/2012/December/12-crm-1478.html (last visited June 28, 2013).

[9] *See Attorney Brendan Sullivan, Counsel for Lieutenant Colonel Oliver North, Tells the Iran-Contra Committee He is Not a Potted Plant and that It Is His Job to Answer for His Client*, NBC NEWS (July 9, 1987), http://www.nbcuniversalarchives.com/nbcuni/clip/5112536441_003.do.

sentences . . . .") (internal citations omitted). In the deferred prosecution context, the defendant is presented with the opportunity for diversion from the criminal proceeding altogether. For obvious reasons, a defendant in these circumstances is less likely to raise a purported impropriety with the process, let alone seek the court's aid in redressing it, given the risk of derailing the deferral of prosecution.

Nevertheless, it is easy to imagine circumstances in which a deferred prosecution agreement, or the implementation of such an agreement, so transgresses the bounds of lawfulness or propriety as to warrant judicial intervention to protect the integrity of the Court. For example, the DPA, like all such agreements, requires HSBC to "continue to cooperate fully with the [government] in any and all investigations." DPA ¶ 6. Recent history is replete with instances where the requirements of such cooperation have been alleged and/or held to violate a company's attorney-client privilege and work product protections,[10] or its employees' Fifth[11] or

---

[10] For nearly ten years – from 1999 to 2008 – the Department of Justice's corporate charging policies, as articulated in the Holder, Thompson, McCallum, and McNulty Memos, emphasized the importance of corporate cooperation, including a willingness to waive the attorney-client and work product protections. *See* Memorandum from Eric H. Holder, Jr., Deputy Att'y Gen., U.S. Dep't of Justice, to All Component Heads and U.S. Att'ys (June 16, 1999), *available at* http://www.justice.gov/criminal/fraud/documents/reports/1999/charging-corps.PDF (last visited June 28, 2013) [hereinafter Holder Memo]; Memorandum from Larry D. Thompson, Deputy Att'y Gen., U.S. Dep't of Justice, to Heads of Dep't Components and U.S. Att'ys (Jan. 20, 2003), *available at* http://www.albany.edu/acc/courses/acc695spring2008/thompson%20memo.pdf (last visited June 28, 2013) [hereinafter Thompson Memo]; Memorandum from Robert D. McCallum, Jr., Acting Deputy Att'y Gen., U.S. Dep't of Justice, to Heads of Dep't Components and U.S. Att'ys (Oct. 21, 2005), *available at* http://lawprofessors.typepad.com/whitecollarcrime_blog/files/AttorneyClientWaiverMemo.pdf (last visited June 28, 2013); Memorandum from Paul J. McNulty, Deputy Att'y Gen., U.S. Dep't of Justice, to Heads of Dep't Components and U.S. Att'ys (Dec. 12, 2006), *available at* http://www.justice.gov/dag/speeches/2006/ mcnulty_memo.pdf (last visited June 28, 2013).

These policies engendered an enormous backlash. They catalyzed the formation of the Coalition to Preserve the Attorney-Client Privilege, composed of a broad swath of organizations including the American Civil Liberties Union, the Association of Corporate Counsel, the National Association of Criminal Defense Lawyers, and the United States Chamber of Commerce. *Answers to Questions About the Attorney-Client Privilege*, ABANOW (Dec. 1, 2006), http://www.abanow.org/2006/12/answers-to-questions-about-the-attorney-client-privilege/ ("The Coalition to Preserve the Attorney-Client Privilege represents a remarkable political and philosophical diversity, demonstrating just how widespread concerns about government policy in this area have become in the business, legal, and public policy communities."). It also led the American Bar Association ("ABA") to create the Presidential Task Force on Attorney-Client Privilege to study and address the erosion of attorney-client privilege. *ABA President Robert Grey Creates Task Force to Advocate for Attorney-Client Privilege*, ABANOW (Oct. 6, 2004), http://www.abanow.org/2004/10/aba-president-robert-grey-creates-task-force-to-advocate-for-attorney-client-privilege/. In August 2005, the ABA House of Delegates approved Recommendation 111, submitted by the Task Force, which held:

Sixth Amendment rights.[12] The DPA also contemplates, in the event of a breach by HSBC, an explanation and remedial action, which the government will consider in determining whether to prosecute the pending charges and/or bring new ones. DPA ¶¶ 16-17. What if, for example, the "remediation" is an offer to fund an endowed chair at the United States Attorney's *alma mater*?

---

> RESOLVED, that the American Bar Association strongly supports the preservation of the attorney-client privilege and work product doctrine as essential to maintaining the confidential relationship between client and attorney required to encourage clients to discuss their legal matters fully and candidly with their counsel so as to (1) promote compliance with law through effective counseling, (2) ensure effective advocacy for the client, (3) ensure access to justice and (4) promote the proper and efficient functioning of the American adversary system of justice; and
>
> FURTHER RESOLVED, that the American Bar Association opposes policies, practices and procedures of governmental bodies that have the effect of eroding the attorney-client privilege and work product doctrine and favors policies, practices and procedures that recognize the value of those protections.
>
> FURTHER RESOLVED, that the American Bar Association opposes the routine practice by government officials of seeking to obtain a waiver of the attorney-client privilege or work product doctrine through the granting or denial of any benefit or advantage.

REPORT TO THE ABA HOUSE OF DELEGATES, ABA TASK FORCE ON THE ATTORNEY-CLIENT PRIVILEGE 3 (2006), *available at* http://apps.americanbar.org/buslaw/newsletter/0052/materials/pp4.pdf (last visited June 28, 2013). In August 2008 the DOJ revised its corporate charging guidelines to provide, *inter alia*, that credit for cooperation would no longer depend on a corporation's waiver of the attorney-client privilege or work product protections. Press Release, U.S. Dep't of Justice, Justice Department Revises Charging Guidelines for Prosecuting Corporate Fraud (Aug. 28, 2008), *available at* http://www.justice.gov/opa/pr/2008/August/08-odag-757.html (last visited June 28, 2013).

[11] The DOJ's corporate charging policies, as articulated in the Holder and Thompson Memos, also instructed federal prosecutors to consider the extent to which a cooperating company makes witnesses available to the government. Holder Memo, *supra* note 9, at 5; Thompson Memo, *supra* note 9, at 6. In *United States v. Stein*, the United States District Court for the Southern District of New York held that by pressuring the corporate defendant to use its power over its employees to coerce them to make statements to the government, such coercive tactics were attributable to the government, and suppressed some of the statements made by employees. 440 F. Supp. 2d 315, 337-38 (S.D.N.Y. 2006).

[12] The DOJ's corporate charging policies, as articulated in the Holder and Thompson Memos, also instructed federal prosecutors to consider a company's advancing of legal fees to employees, except as required by law, as potentially indicative of an attempt to shield culpable individuals, and therefore a factor weighing in favor of indictment of the company. Holder Memo, *supra* note 9, at 6; Thompson Memo, *supra* note 9, at 7-8. In *United States v. Stein*, the United States District Court for the Southern District of New York held in another opinion that the government, in "tak[ing] into account, in deciding whether to indict [the corporate defendant], whether [the corporate defendant] would advance attorneys' fees to present or former employees in the event they were indicted . . . interfered with the rights of such employees to a fair trial and to the effective assistance of counsel and therefore violated the Fifth and Sixth Amendments to the Constitution." 435 F. Supp. 2d 330, 382 (S.D.N.Y. 2006). The Second Circuit affirmed this decision, finding that the government had "unjustifiably interfered with [employees'] relationship with counsel and their ability to mount a defense, in violation of the Sixth Amendment," but did not reach the lower court's Fifth Amendment ruling. *United States v. Stein*, 541 F.3d 130, 136 (2d Cir. 2008).

Or consider a situation where the current monitor needs to be replaced. *See* Gov't Letter, June 5, 2013, ECF No. 22 (advising the Court of the selection of an independent compliance monitor). What if the replacement's only qualification for the position is that he or she is an intimate acquaintance of the prosecutor proposing the appointment? *See* DPA ¶ 10 ("The Department may also propose the names of qualified Monitor candidates for consideration.").

I do not intend to catalog all of the possible situations that might implicate the Court's supervisory power in this case. I couldn't even if I wanted to; the exercise would amount to looking through a glass, darkly, at five years of potential future developments in the case. What I can say with certainty is that by placing the DPA on the Court's radar screen in the form of a pending criminal matter, the parties have submitted to far more judicial authority than they claim exists.

B.     *Approval of the DPA*

I approve the DPA. However, for the reasons set forth above, my approval is subject to a continued monitoring of its execution and implementation.

In approving the DPA, I am as mindful of the limits of the supervisory power as I am of its existence. For the most part, "when supervisory powers have been invoked the Court has been faced with intentional illegal conduct." *Payner*, 447 U.S. at 746 (Marshall, J., dissenting). My review of the DPA, and my knowledge of the actions that have been taken pursuant to the DPA thus far, reveal no impropriety that implicates the integrity of the Court and therefore warrants the rejection of the agreement.

I am aware of the heavy public criticism of the DPA. *See, e.g.* Editorial, *Too Big to Indict*, N.Y. TIMES, Dec. 11, 2012; Jesse Singal, *HSBC Report Should Result in Prosecutions, Not Just Fines, Say Critics*, THE DAILY BEAST, July 18, 2012; Matt Taibbi, *Gangster Bankers:*

*Too Big to Jail*, ROLLING STONE, Feb. 14, 2013. Indeed, I have received unsolicited input from members of the public urging me to reject the DPA. *See* ECF Nos. 16, 17, 18, 21. These criticisms boil down to the argument that the government should seek to hold HSBC criminally liable, rather than to divert HSBC from the criminal process. But even if I were to reject the DPA, I would have no power to compel the government to prosecute the pending charges against HSBC to adjudication. To the contrary, as mentioned above, if the government moved under Fed. R. Crim. P. 48(a) to dismiss the Information, it would be an abuse of discretion not to grant that motion.

Significant deference is owed the Executive Branch in matters pertaining to prosecutorial discretion. The Executive Branch alone is vested with the power to decide whether or not to prosecute. *United States v. Bonnet-Grullon*, 212 F.3d 692, 701 (2d Cir. 2000) ("It is well established that the decision as to what federal charges to bring against any given suspect is within the province of the Executive Branch of the government."), *superseded by statute on other grounds by United States v. Levia-Deras*, 359 F.3d 183, 188 (2d Cir. 2004). The decision whether to seek a criminal conviction implicates a complex of factors that "do not lend themselves to resolution by the judiciary." *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375, 380 (2d Cir. 1973) (stating that "the task of supervising prosecutorial decisions" would place reviewing courts "in the undesirable and injudicious posture of becoming 'superprosecutors.'"). The Supreme Court has observed that a prosecutor's

> broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent

> to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern.

*Wayte v. United States*, 470 U.S. 598, 607 (1985). With respect to cases of corporate misconduct, prosecutors must consider such factors as the nature and seriousness of the conduct, the pervasiveness of the conduct within the company, and the company's reaction to its own misconduct. They must also consider the ripple effects a conviction might have on innocent parties, such as employees (present and former) and shareholders. I have no doubt resource allocations concerns within the Department of Justice ("DOJ") play a legitimate role as well. Judges (even, and perhaps especially, judges who themselves once exercised prosecutorial discretion) need to be mindful that they have no business exercising that discretion and, as an institutional matter, are not equipped to do so.

I observed many years ago that although the Supreme Court's language in *Wayte* addressed "the decision of *whether* to prosecute, it is equally applicable to the decision of how aggressively to prosecute, and specifically to whether an arguably reasonable sentence bargain is appropriate." John Gleeson, *Sentence Bargaining Under the Guidelines*, 8 FED. SENT'G REP. 314, 315 (1996) ("[T]he judicial policing of sentence bargaining is unrealistic. The prosecutor may defend a plea agreement by reference to an office policy on such cases, but the probation officer may conclude that the AUSA is simply too lazy to try the case, or overly intimidated by the defense attorney. The probation officer may be right, but courts have no business engaging in that inquiry and have no ability to do so."). I add here that this language is just as applicable to the decision to enter into a deferred prosecution agreement.

Bearing in mind the appropriate degree of deference that is owed to the Executive Branch, the decision to approve the DPA is easy, for it accomplishes a great deal.

1. *HSBC's Offense Conduct*

According to the Statement of Facts, incorporated as part of the DPA, from 2006 to 2010, HSBC Bank USA failed to implement an effective AML program to monitor suspicious transactions from Mexico. Statement of Facts ¶ 9, ECF No. 3-3. During the same period, Grupo Financiero HSBC, S.A. de C.V. ("HSBC Mexico"), one of HSBC Bank USA's largest Mexican customers, had its own significant AML failings. *Id*. These collective AML failures permitted Mexican and Colombian drug traffickers to launder at least $881 million in drug trafficking proceeds through HSBC Bank USA undetected. *Id*. HSBC Holdings was aware of HSBC Mexico's AML compliance problems as early as 2002, but failed to inform HSBC Bank USA of these problems or their potential impact on HSBC Bank USA's AML program. *Id*. ¶¶ 9, 42-45; *see also* Gov't Mem. in Supp. DPA 6.

In addition, from at least 2000 to 2006, HSBC Group[13] knowingly and willfully engaged in practices outside the United States that caused HSBC Bank USA and other U.S. financial institutions to process payments on behalf of banks and other entities located in Cuba, Iran, Libya, Sudan, and Burma, in violation of U.S. sanctions. Statement of Facts ¶ 63. HSBC Group Affiliates[14] ensured that these transactions went undetected in the U.S. by altering and routing payment messages in a manner that hid the identities of these sanctioned identities from HSBC Bank USA and other U.S. financial institutions. *Id*. The total value of these transactions during this period was approximately $660 million. *Id*.

The government identifies three major causes for the failures in HSBC's AML and sanctions programs. Gov't Mem. in Supp. DPA 6-9. First, there was an "an institution-wide lack of accountability and diffusion of responsibility." *Id*. at 7. "At the HSBC Holdings level,

---

[13] HSBC Group refers collectively to HSBC Holdings and its subsidiaries. Statements of Facts ¶ 3.
[14] HSBC Group Affiliates "refer to financial institutions throughout the world . . . that are owned by various intermediate holding companies and ultimately, but indirectly, by HSBC Holdings." *Id*.

16

HSBC Group Compliance lacked the authority to mandate corrective or other action by any HSBC Group Affiliate." *Id*. And "[a]t the Affiliate level, HSBC's internal policies about whether AML officers or business executives were ultimately responsible for the AML and sanctions programs were unclear." *Id*. The result was that AML compliance and sanctions problems, even when identified at the HSBC Holdings level, went unresolved.

Second, HSBC Bank USA failed to provide adequate staffing and other resources to maintain an effective AML program. Statement of Facts ¶¶ 25-28. Beginning in 2007, HSBC Bank USA began to "freeze" staffing levels in its AML department "as part of a bank-wide initiative to cut costs and increase the bank's return on equity." *Id*. ¶ 25. As a result of this policy, HSBC Bank USA and HSBC North America Holdings, Inc. ("HSBC North America"[15]) did not replace departing compliance and AML staff, even senior officers such as HSBC Bank USA's AML Director and HSBC North America's Regional Compliance Officer (who oversaw compliance and AML at HSBC Bank USA). *Id*. ¶¶ 25-26. HSBC Bank USA also combined multiple positions into one, for example, charging HSBC Bank USA's Head of Compliance with the responsibilities of HSBC Bank USA's AML Director, and charging HSBC North America's General Counsel with the responsibilities of HSBC North America's Regional Compliance Officer. *Id*. Finally, "requests for additional resources were discouraged and, ultimately [AML] employees stopped making staffing requests." *Id*. ¶ 28.

Third, the corporate culture of HSBC "discouraged sharing of information within the organization." Gov't Mem. in Supp. DPA 8. At the HSBC Holdings level, a philosophy that "HSBC does not 'air the dirty linen of one affiliate with another,'" defined the approach to compliance. Statement of Facts ¶ 45 (quoting HSBC's Head of Compliance). As a result, HSBC

---

[15] HSBC Bank USA is a subsidiary of HSBC North America, which, in turn, is an indirect subsidiary of HSBC Holdings. *Id*.

Holdings failed to inform HSBC Bank USA about HSBC Mexico's AML compliance problems or their potential impact on HSBC Bank USA's AML program. *Id*. ¶¶ 42-45. At the HSBC Bank USA level, it adhered to a formal policy not to conduct due diligence on other HSBC Group Affiliates, which "impeded [its] ability to assess its money laundering vulnerabilities, including the extensive AML problems at HSBC Mexico." Gov't Mem. in Supp. DPA 8-9; Statement of Facts ¶ 15. "With respect to U.S. sanctions, despite HSBC Bank USA's request for full details in transactions processed by HSBC Group Affiliates, some Group Affiliates structured transactions so that . . . HSBC Bank USA could not properly review the transactions to determine whether they violated U.S. sanctions." Gov't Mem. in Supp. DPA 9; Statement of Facts ¶¶ 65-67.

2. *The Deferred Prosecution Agreement*

The DPA requires HSBC to undertake (or continue to undertake) remedial measures that address these systemic failures. HSBC Holdings and HSBC North America have overhauled their leadership teams. HSBC Holdings installed a new Chief Executive Officer ("CEO"), Chairman, Chief Legal Officer, and Head of Global Standards Assurance; HSBC North America installed a new CEO, General Counsel, Chief Compliance officer, AML Director, Deputy Chief Compliance Officer, and Deputy Director of Global Sanctions. DPA ¶¶ 5(a), (m).

HSBC Holdings and HSBC Bank USA have taken steps to address the lack of accountability over their AML and sanctions compliance programs. HSBC Holdings elevated the Head of HSBC Group Compliance to the status of a Group General Manager, one of the 50 most senior positions at HSBC globally, and granted him direct oversight over every HSBC compliance and AML officer. *Id*. ¶¶ 5(q)-(r); Gov't Mem. in Supp. DPA 12. It also restructured its senior executive bonus system so that bonuses are dependent on meeting compliance and

AML standards. DPA ¶ 5(v). HSBC Bank USA reorganized its AML department "to strengthen its reporting lines and elevate its status within the institution as a whole" by, *inter alia*, requiring that the AML Director report directly to the Board and senior management regarding HSBC Bank USA's AML program. *Id.* ¶ 5(e).

HSBC Bank USA has made significant investments in its AML program, spending $244 million in 2011. *Id.* ¶ 5(c). It increased its AML department staff from 92 full-time employees and 25 consultants in January 2010 to approximately 880 full-time employees and 267 consultants as of May 2012. *Id.* ¶ 5(d). Whereas in 2008, it had only four employees to review suspicious wire transactions, it now employs approximately 430 individuals to undertake this task. Gov't Mem. in Supp. DPA 8.

Finally, HSBC has taken steps to promote the sharing of information within the organization. HSBC Holdings "implemented procedures that require the sharing of information pertaining to AML weaknesses at one Group Affiliate horizontally throughout the HSBC Group." Gov't Mem. in Supp. DPA 13-14 (citing DPA ¶ 5(t)). HSBC Bank USA has reformed its due diligence and risk-rating policies so as to subject HSBC Group Affiliates to a heightened level of scrutiny. DPA ¶¶ 5(f)-(g). And it has implemented a new monitoring system, which allows it to track the originator, sender, and beneficiary of every wire transaction that moves through HSBC Bank USA. *Id.* ¶ 5(j).

The DPA requires a corporate compliance monitor to supervise HSBC's remedial measures, as well as evaluate HSBC's ongoing compliance with the BSA, IEEPA, and TWEA, during the pendency of the agreement. *Id.* ¶ 5; *see also* Corporate Compliance Monitor, ECF No. 3-4. The monitor will report regularly to the DOJ regarding HSBC's compliance with and/or violation of the DPA. Corporate Compliance Monitor ¶¶ 3, 8. The monitor is charged

with making recommendations for improving HSBC's effectiveness in implementing compliance and remedial measures; HSBC is required, under the DPA, to comply with such recommendations. *Id*. ¶ 5.

In addition to remedial measures, the DPA also requires HSBC to forfeit $1.256 *billion* and to admit to criminal wrongdoing, as set forth in the Statement of Facts. *Id*. ¶¶ 1-2, 7; *see also* Statement of Facts. Considered together, the DPA imposes upon HSBC significant, and in some respect extraordinary, measures. Indeed, taking into account the fact that a company cannot be imprisoned, it appears to me that much of what might have been accomplished by a criminal conviction has been agreed to in the DPA. In any event, in light of the broad deference owed by the Court to the prosecutor's actions, I approve without hesitation both the DPA and the manner in which it has been implemented thus far.

C.      *The Court Retains Supervisory Power over the Implementation of the DPA*

As long as the government asks the Court to keep this criminal case on its docket, the Court retains the authority to ensure that the implementation of the DPA remains within the bounds of lawfulness and respects the integrity of this Court. Accordingly, the parties are directed to file quarterly reports with the Court to keep it apprised of all significant developments in the implementation of the DPA. Doubts about whether a development is significant should be resolved in favor of inclusion. The Court will notify the parties if, in its view, hearings or other appearances are necessary or appropriate.

So ordered.

John Gleeson, U.S.D.J.

Dated: July 1, 2013
        Brooklyn, New York