| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | FOR ONLINE PUBLICATION |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- versus -<br><br>HSBC BANK USA, N.A. AND HSBC<br>HOLDINGS PLC,<br><br>                              Defendants. | MEMORANDUM<br>AND ORDER<br>12-CR-763 (JG) |

JOHN GLEESON, United States District Judge:

As part of a deferred prosecution agreement ("DPA"), HSBC agreed to the appointment of a corporate compliance monitor ("Monitor") to supervise HSBC's compliance with the law during the pendency of the DPA. Hubert Dean Moore, Jr. seeks access to the Monitor's First Annual Follow-Up Review Report ("Monitor's Report" or "Report") evaluating HSBC's performance. HSBC and DOJ do not want the public to have access to the Report. I find that the Report is a judicial record, and that the public has a First Amendment right to see the Report. Further, I have balanced the public's right to access with the government's and HSBC's concerns with unsealing the Report, and I order the parties to submit to me for review a redacted version of the Report, as detailed below.

## FACTUAL BACKGROUND

In December 2012, the government charged HSBC Bank USA, N.A. with willfully failing to maintain an effective anti-money laundering ("AML") program, in violation of the Bank Secrecy Act, 31 U.S.C. § 5311 *et. seq.*, and HSBC Holdings PLC with willfully facilitating financial transactions on behalf of sanctioned entities, in violation of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1702 & 1705, and the Trading with the Enemy

Act ("TWEA"), 50 U.S.C. App. §§ 3, 5, 16.[1]  Information, ECF No. 3-1, Dec. 11, 2012.

Simultaneously, the government publicly filed a DPA requesting that I hold the case in abeyance for five years in accordance with the terms of the DPA, a statement of facts describing HSBC's alleged misconduct, and a Corporate Compliance Monitor agreement.  *See* ECF Nos. 3-2 (DPA), 3-3 (Statement of Facts), 3-4 (Corporate Compliance Monitor Agreement).  According to the DPA, if after five years HSBC has complied with the terms and provisions of the DPA, the government will seek to dismiss the Information with prejudice; if not, the government may prosecute HSBC "for any federal criminal violation of which [the government] has knowledge," including—but not limited to—the charges in the already-filed Information.[2]  DPA ¶¶ 15-16.

       I preliminarily approved the DPA pursuant to my supervisory power on July 1, 2013 and granted the parties' request to hold the case in abeyance for five years pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(2).  *United States v. HSBC Bank USA, N.A.*, 2013 WL 3306161 (E.D.N.Y. July 1, 2013) ("*HSBC I*").  I gave this tentative approval after reviewing the terms of the DPA, and—of particular relevance here—in reliance on the Monitor's supervision over HSBC's implementation of remedial measures and ongoing compliance with the laws under which it was charged.  *See id.* at *10-11.  In giving this approval, I specifically stated that it is "subject to a continued monitoring of [the DPA's] execution and implementation."  *Id.* at *7.  I retained my supervisory power over the implementation of the DPA and directed the government to file quarterly reports with me, as well as keep me apprised "of all significant developments in the implementation of the DPA," for as long as the open criminal case remained pending before me.  *Id.* at *11.

---

[1]     In this opinion, I refer to HSBC Bank USA, N.A. and HSBC Holdings PLC together as "HSBC."
[2]     A full discussion of the terms of the deferred prosecution agreement and HSBC's criminal conduct is set forth in *United States v. HSBC Bank USA, N.A.*, 2013 WL 3306161 (E.D.N.Y. July 1, 2013).

In January 2015, the Monitor issued the Report, which set forth his "findings and assessment of the then-current state of HSBC Group's AML and sanctions compliance program and of the Bank's progress over the course of the preceding year in improving its AML and sanctions compliance program." Cherkasky Aff., ECF No. 35-1, ¶ 4 (June 1, 2015). On April 1, 2015, the government filed a six-page status report purporting to summarize the Monitor's conclusions.[3] Status Report, ECF No. 33. On April 28, 2015, I ordered the government to file the Monitor's Report with the Court. On June 1, 2015, the government filed the Report under seal, ECF Nos. 36-37, and on November 3, 2015, Moore wrote a letter to the Court, which I construed to be a motion to unseal the Report. *See* ECF No. 42 (Moore's Letter); Order, Nov. 6, 2015. I heard oral argument on the application to unseal the Report on January 15, 2016, and now grant that application to the extent set forth below.

## DISCUSSION

The inquiry in this case—whether to allow the public to see the Monitor's Report—explores the bounds of a court's duty to "ensure that ours is indeed a government of the people, by the people, and for the people." *United States v. Erie County, N.Y.*, 763 F.3d 235, 239 (2d Cir. 2014). One of the ways this seemingly abstract principle of governance directly affects the job responsibilities of a federal judge is the duty it creates to uphold the public's right of access to judicial documents.[4] Both the common law and the First Amendment give the public

---

[3] The Report itself is more than 250 pages. Additionally, it has six lengthy appendices.
[4] The government and HSBC contend in their written submissions that the Monitor's Report—with its focus on HSBC's systems to detect and prevent money laundering—would not do much to help Moore. *See* Gov't Letter in Response to Application to Unseal Monitor Report, ECF No. 45, at 4-5 (Dec. 11, 2015); HSBC Letter in Response to Application to Unseal Monitor Report, ECF No. 46, at 6-7 (Dec. 11, 2015). This argument is immaterial. The Monitor's Report could have no useful information for Moore, and he—as a member of the public—would still have a right to see it. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98 (1978) ("American decisions generally do not condition enforcement of [the right to inspect public records and documents] on a proprietary interest in the document or upon a need for it as evidence in a lawsuit."); *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("[W]e believe motive generally to be irrelevant to defining the weight accorded the presumption of access.").

3

this right. *See, e.g.*, *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*") ("The common law right of public access to judicial documents is said to predate the Constitution."); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004) (members of the public have a "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents").

A.   *The Monitor's Report is a Judicial Document*

Before I can analyze whether the public's right of access under the common law or the First Amendment compel me to unseal the Monitor's Report, I must determine whether the Report is a judicial document. *Erie County*, 763 F.3d at 239-40. I may consider the Monitor's Report a "judicial document" if it is "relevant to the performance of the judicial function and useful in the judicial process." *Amodeo I*, 44 F.3d at 145. I conclude that it is.

Precedent supports this decision. As in *Amodeo I* and *Erie County*, "the reports were filed with the District Court by an expert whose duties were to oversee compliance." *Erie County*, 763 F.3d at 240 (citing *Amodeo I*, 44 F.3d at 146). Further, although the reports at issue in *Amodeo I* were "prepared by a court-appointed officer pursuant to a consent decree," and the parties here chose their own compliance monitor pursuant to the DPA, the Second Circuit has already held that "distinction [to be] of little importance." *Erie County*, 763 F.3d at 240. "What matters is that the reports are filed with the District Court and become relevant to *its* judicial activities." *Id.* (emphasis in original).

There is an open criminal case before me. As the government puts it, my authority here "is to ensure that the DPA remains within the bounds of lawfulness and respects the integrity of this Court." Gov't Mot. for Leave to File Monitor's Report Under Seal, ECF No. 35, at 6 (June 1, 2015) ("Gov't Br."). I cannot perform that task without receiving at least some

4

updates from the parties about HSBC's compliance with the DPA. Indeed, I specifically directed the parties to keep me "apprised of all significant developments in the implementation of the DPA." *HSBC I*, 2013 WL 3306161, at *11. Believing the Monitor's Report to qualify as one of these "significant developments," I directed the government to file the Report with the Court in April 2015.[5] Order, April 28, 2015. The government did so on June 1, 2015. *See* ECF Nos. 36-37.

        The government also argues that because the Monitor's Report had not been written when I approved the DPA, "the Report could have played no role" in my decision, and therefore, the argument continues, it is irrelevant to my judicial function. Gov't Br. at 5. But as mentioned above, my approval of the DPA was preliminary; it was and remains contingent upon my "continued monitoring of its execution and implementation." *HSBC I*, 2013 WL 3306161, at *7. In this way, the relationship of the Report to my judicial function is markedly different than that in *S.E.C. v. Am. Int'l Grp.*, where the court found, in a civil case, that the independent consultant's reports did not "record, explain, or justify the court's decision [in its earlier approval of a consent decree] in any way" and that "nothing in the record suggest[ed] the district court cared a whit about the results of the independent consultant's investigation." 712 F.3d 1, 4 (D.C. Cir. 2013). I care a great deal about the results of the Monitor's investigation; my review of those results is necessary to do my job properly.

        The government argues that I am "charged neither with enforcing or granting relief from the Monitor's efforts nor with playing any role in the Monitor's work," Gov't Br. at

---

[5] I am not swayed by the fact that the parties did not contemplate that the Report would be filed with the Court. *See Amodeo I*, 44 F.3d at 143-44 (affirming a decision to unseal portions of a Court Officer's report—filed in connection with a consent decree settling the underlying action—even though the consent decree did not obligate the officer to file anything with the court and she "averred that she never intended that the public have access to the confidential status reports").

6, but that argument misses the point.  My job is to oversee the unfolding of the criminal case that the government chose to file in my court.  The parties, in the DPA, made the Monitor's work a component of the case, and thus made the instant Report critical to the execution of my duties.  If, for example, the Monitor's Report disclosed that HSBC were systematically and extensively laundering money for drug traffickers, it would demean this institution for me to sit by quietly while the government took no action.  Indeed, my oversight of the DPA and the open criminal case goes to the heart of the public's right of access:  federal courts must "have a measure of accountability," and the public must have "confidence in the administration of justice."  *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*").  Most tellingly, even a "[d]istrict [c]ourt's inaction is subject to public accountability."  *Erie County*, 763 F.3d at 240.  These are important interests that the government itself chose to implicate by resolving its investigation of HSBC in a manner that involved the filing of a pending criminal case.

The Monitor's Report will also be integral to the future resolution of the case.  If the government determines that HSBC has breached the terms of the DPA, and presses forward to an adjudication of the four pending charges, *see* DPA ¶¶ 4, 16, this Court will oversee those proceedings.  If the government determines that HSBC has complied with the terms of the DPA, it will seek to dismiss the charges against HSBC at the end of the DPA's term.  DPA ¶ 15.  But the parties can only effectuate such a dismissal "with leave of court."  Fed. R. Crim. P. 48.  Although Rule 48 gives the government "near-absolute power . . . to extinguish a case that it has brought," *HSBC I*, 2013 WL 3306161, at *5, leave of court may be denied if the dismissal is "clearly contrary to manifest public interest."  *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991) (internal quotation marks omitted).  That determination cannot properly be made without judicial review of the Report.  Thus, even if the government chooses to dismiss

this case, that decision will invoke the Court's authority in a way that the government's decision not to prosecute in the first instance would not.

The Monitor's Report here is thus directly relevant to my judicial function, and as a result falls squarely within the definition of a judicial document. Having so concluded, I would ordinarily analyze the public's common law right of access. However, because I find "that the [Monitor's Report] [is] subject to a First Amendment right of access, which is stronger and can only be overcome under more stringent circumstances than the common law presumption," I turn directly to the protections given to the public by the First Amendment. *Erie County*, 763 F.3d at 241.

B.  *Right of Access Under the First Amendment*

A First Amendment right attaches to judicial documents for which "experience and logic" support public access. Under the "experience and logic" text, I "consider both whether the documents 'have historically been open to the press and general public' and whether 'public access plays a significant positive role in the functioning of the particular process in question.'" *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 120 (2d Cir. 2006) (quoting *Hartford Courant Co.,* 380 F.3d at 92).

   1.  *The Experience Prong*

The government argues that its decision "whether a defendant is abiding by the terms of a DPA" is akin to a charging decision, and that documents supporting that decision are typically non-public. Gov't Br. at 7 (citing *United States v. Haller*, 837 F.2d 84, 87-88 (2d Cir. 1988) (discussing the need for secrecy in grand jury proceedings)). But this argument skates over the fact that the government has already brought charges against HSBC. A DPA is not analogous to documents related to *building* a case; it provides for the *undoing* of an already-filed

7

case. The government did not begin to employ DPAs with companies until the early 1990s,[6] so there is scant historical evidence of public access to documents in the precise posture of the Monitor's Report at issue here.

Even so, "the notion of public access to judicial documents is a capacious one: the courts of this country have long recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Erie County*, 763 F.3d at 242 (citing *Nixon*, 435 U.S. at 597). And the First Amendment right of public access applies both to the trial as well as pretrial phases of a criminal proceeding. *See Application of The Herald Co.*, 734 F.2d 93, 98-99 (2d Cir. 1984). In extending the right of public access to pretrial proceedings—even though pretrial proceedings were not public at common law—the Second Circuit noted that "[t]here is a significant benefit to be gained from public observation of many aspects of a criminal proceeding." *Id.* at 98.

When all goes well for the defendant, a DPA is, at its core, a substitute for a plea agreement or a trial—to both of which the public has historically had a First Amendment right of access. *See, e.g.*, *Haller*, 837 F.2d at 86 ("[T]here is a right of access to plea hearings and to plea agreements."). And the Monitor's Report is integral to the fulfilment of my continuing obligation to monitor the execution and implementation of the DPA. I conclude that the public's right of access extends to such documents. *Cf. Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (unsealing pleadings and exhibits filed in connection with a summary judgment motion because summary judgment serves as a substitute for trial in adjudicating the parties' substantive rights). Accordingly, I find that "experience" supports unsealing the Monitor's Report.

---

[6] *See* Eugene Illovsky, *Corporate Deferred Prosecution Agreements: The Brewing Debate*, Crim. Just., Summer 2006, at 36, *available at* http://www.abanet.org/crimjust/cjmag/21-2/corporatedeferred.pdf.

2. *The Logic Prong*

I also find that "logic bears out this experience, since 'public access plays a significant positive role in the functioning of the particular process in question.'" *Erie County*, 763 F.3d at 242 (quoting *Lugosch*, 435 F.3d at 120). This case implicates matters of great public concern, and is "therefore one[] which the public has an interest in overseeing." *Id.* DOJ and the Court are public institutions. HSBC Bank USA, N.A. "serves 2.4 million customers through retail banking and wealth management, commercial banking, private banking, asset management, and global banking and markets segments" and "operates more than 230 bank branches throughout the United States." Factsheet, HSBC Bank USA, at 1 (Dec. 2015), *available at* http://www.about.us.hsbc.com/hsbc-in-the-usa ("HSBC Factsheet"). It is an indirect subsidiary of HSBC Holdings PLC,[7] which has shares listed in London, Hong Kong, Paris, and Bermuda, and has an American Depositary Receipt ("ADR") program in the United States. Share Information, HSBC, *available at* http://www.hsbc.com/investor-relations/share-information. HSBC Holdings PLC is self-described as "one of the world's largest banking and financial services organizations." HSBC Factsheet at 2.

Given the institutions involved, and HSBC's structure and impact, it is no wonder that after the parties filed their DPA, I became aware of "heavy public criticism of the DPA," and "received unsolicited input from members of the public urging me to reject the DPA." *HSBC I*, 2013 WL 3306161, at *7 (citing Editorial, *Too Big to Indict,* N.Y. Times, Dec. 11, 2012; Jesse Singal, *HSBC Report Should Result in Prosecutions, Not Just Fines, Say Critics,* The Daily Beast, July 18, 2012; Matt Taibbi, *Gangster Bankers: Too Big to Jail,* Rolling Stone, Feb.

---

[7] HSBC North America Holdings Inc. is the holding company for HSBC Holding PLC's operations in the United States. HSBC Factsheet at 2. HSBC Bank USA, N.A. is the principal subsidiary of HSBC USA Inc., which in turn is an indirect, wholly-owned subsidiary of HSBC North America Holdings Inc. *Id.* at 1.

14, 2013; ECF Nos. 16, 17, 18, 21). It was appropriate and desirable for the public to view and comment on the widespread nature of the criminal conduct documented in the Statement of Facts, and to view and comment upon DOJ's decision to file a DPA in the public forum of this courthouse. It is equally appropriate and desirable for the public to be interested and informed now in the progress of the arrangement between DOJ and HSBC that the government chose to make the centerpiece of a federal criminal case, and in whether I am doing my job of monitoring the execution and implementation of that arrangement. *See Erie County*, 763 F.3d at 242 ("Access to the compliance reports enables the public to understand, monitor, and respond to the progress made towards altering what the Department of Justice, as enforcer of the nation's laws, alleged were [violations of the conduct at issue].").

Thus, because of the historical practice of allowing public access to documents filed in connection with important criminal proceedings, and because the interests of transparency, accountability, and credibility remind me "of the logic of democratic monitoring of judicial processes," *Id.* at 243, I find that the First Amendment right of access attaches to the Monitor's Report.

C.  *Narrow Tailoring Under the First Amendment*

Even if the First Amendment right of access has attached to a judicial document, a court may still seal that document in whole or in part "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) (internal quotation marks omitted). The government and HSBC advance four such interests.

First, the parties argue that the Monitor's (and thus the government's)[8] ability to assess HSBC's compliance with the terms of the DPA will be negatively impacted by the potential chilling effect that making the Report public would have on HSBC employees in cooperating with the Monitor. *See* HSBC Letter in Response to Application to Unseal Monitor Report, ECF No. 45, at 4-5 (Dec. 11, 2015) ("HSBC Letter"). The parties also contend that I should consider the privacy interests of the employees, because they are innocent third parties. Gov't Br. at 7-8. I share these concerns, but conclude that targeted redactions will easily alleviate them. In *Amodeo II*, the Second Circuit found that concerns about the chilling effect that making a report public may have on "confidential informants helpful to [the] monitoring of the consent decree" were ameliorated by the district court's redactions. 71 F.3d at 1052. Accordingly, I will redact any identifying information about HSBC employees. However, the non-identifying information that these employees have provided may be made public without implicating any of the government's and HSBC's raised concerns.[9]

Second, the parties contend that publicizing the Report could give criminals a "road map" to exploit weaknesses in HSBC's AML and sanctions compliance programs. Gov't Br. at 8. I have reviewed the Report, and much of the information is generalized or would likely be otherwise unhelpful to a would-be money launderer. Moreover, the Report "is, to a large extent, historical, as many of the shortcomings have been or are in the process of being rectified," Letter, Hong Kong Monetary Authority, ECF No. 35-4 (May 19, 2015), alleviating the concern that individuals could feed upon HSBC's weaknesses. However, to the extent that

---

[8] The parties make the same argument about the ability of the FCA, Federal Reserve, and other regulators to discharge their supervisory responsibilities over HSBC. Gov't Br. at 8.

[9] This is especially true given the high number of individuals interviewed for the Report. For example, there were over 300 individuals interviewed in connection with the United States Country Review. This large population—accompanied, of course, with redactions of these individuals' names—helps ensure their anonymity.

11

information detailing the processes by which criminals could exploit HSBC exists in the Monitor's Report, that information will be redacted.

Third, the government argues that public disclosure will negatively impact the effectiveness of monitors in future cases, and specifically could "impact the relationship between the Department of Justice and financial regulators in the future when independent monitors are imposed." Gov't Br. at 12. But this concern need not be true; the government did not have to file a DPA in this case. The decision to do so presumably benefitted the parties,[10] but it also means that the government and HSBC are parties to a pending federal criminal case, which, as I stated in *HSBC I*, "is not window dressing." 2013 WL 3306161, at *5. This adage remains true three years into this DPA's term, and will remain true should the government choose to resolve future criminal conduct by way of a DPA. Thus, I find that the government's interest in prohibiting public access to the Report for the sake of its future law enforcement efforts is minimal. *See McNabb v. United States*, 318 U.S. 332, 347 (1943) ("We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement.").

Finally, the government and HSBC argue that disclosure of the Report would negatively affect the Monitor's relationship with foreign regulators, and thus would negatively affect the work product the Monitor could produce. Specifically, they contend that public release of the Report would: contravene assurances the Monitor has given foreign regulators; cause these regulators to "feel misled"; prompt them to withdraw their consent to the Monitor's site visits; and/or compel them to restrict the Monitor's access to confidential information. HSBC Letter at

---

[10] As I stated in *HSBC I*, "[j]ust as a non-prosecution agreement is perceived as a public relations benefit to a company, perhaps the filing and maintenance of criminal charges was intended to produce a public relations benefit for the government." 2013 WL 3306161, at *5.

12

4; *see also* Gov. Br. at 8-9. I credit these claims. Accordingly, five of the six appendices—all except the United States Country Review Report, which will be subject to redactions on the same terms as the Monitor's Report—will remain under seal. Further, country names and explicit references to confidential material, as identified by these foreign jurisdictions, will be redacted from the Monitor's Report and the United States Country Review Report. These blanket measures will ensure that "confidential materials [are] restricted to the FCA, DOJ and FRB [and HSBC]." Cherkasky Aff. ¶ 9.

I disagree with the government and HSBC that the interests the parties have raised cannot be addressed through targeted redactions of the Monitor's Report. *Cf.* Cherkasky Aff. ¶ 13 ("I believe that a redacted report that does not negatively impact the Monitor's work can be produced."). The Monitor warns that because "the report with all of its components is more than 1,000 pages long . . . if the sensitive factual content were to be redacted, the report likely would be materially changed." *Id.* But withholding some of the factual support that gives the Report context and meaning will not render the Report either useless or incomprehensible.[11]

In sum, I find that the parties have set forth several interests that warrant withholding or redacting portions of the Monitor's Report. But because my sealing order must be "narrowly tailored to achieve th[e] aim" of sealing only when "necessary to preserve higher values," I also find that the majority of the Report and the United States Country Review Report will be made public. *Lugosch*, 435 F.3d at 124.

I am mindful of the Second Circuit's admonition in *Amodeo I* that, though "it is proper for a district court, after weighing competing interests, to edit and redact a judicial

---

[11] The Monitor's Report is comprehensive, and long sections summarize the Monitor's findings and the processes that the Monitor took to reach those findings. These sections contain information that the public has a right to see and few specific facts that will need to be redacted.

document in order to allow access to appropriate portions of the document, we consider it improper for the district court to delegate its authority to do so." 44 F.3d at 147. However, I will allow the government and HSBC to submit proposed redactions to the Report on or before February 12, 2016,[12] which I will then review and consider in making the appropriate redactions. When making those redactions, I will be guided by the considerations set forth above, that is, the appropriateness of redacting: (1) identifying information about HSBC employees; (2) information detailing the processes by which criminals could exploit HSBC exists in the Monitor's Report; and (3) country names and explicit references to confidential material, as identified by these foreign jurisdictions.

## CONCLUSION

For the reasons stated above, I grant the motion to unseal the Monitor's Report and the appended United States Country Report, subject to redactions made at the conclusion of the process described above. The government and HSBC shall submit proposed redactions to those two documents on or before February 12, 2016. The other five country reports shall remain under seal.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 28, 2016
Brooklyn, New York

---

[12] The parties may file a copy of the Report with their proposed redactions under seal.