1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,     :    12-CR-763(JG)

5              Plaintiff ,          :
                                         United States Courthouse
6         -against-                 :    Brooklyn, New York

7    HSBC BANK USA, N.A., et al.,   :
                                         January 15, 2016
8              Defendants.          :    10 o'clock a.m.

9    - - - - - - - - - - - - - - X

10
                  TRANSCRIPT OF MOTION HEARING
11          BEFORE THE HONORABLE JOHN GLEESON
                UNITED STATES DISTRICT JUDGE.
12

13   APPEARANCES:

14
     For the Government:          ROBERT L. CAPERS
15                                United States Attorney
                                  BY: DANIEL S. SILVER
16                                    ALEXANDER A. SOLOMON
                                      LAURA BILLINGS
17                                Assistant United States Attorneys
                                  271 Cadman Plaza East
18                                Brooklyn, New York

19

20   For the Defendant HSBC:      SULLIVAN & CROMWELL LLP
                                  125 Broad Street
21                                New York, NY 10004

22                                BY: ALEXANDER WILLSCHER, ESQ.
                                      SAMUEL SEYMOUR, ESQ.
23

24   Also Present:               HUBERT DEAN MOORE, JR.
                                  ANN MARIE MOORE
25

                CMH     OCR     RMR     CRR     FCRR

1   APPEARANCES:   (Continued)

2
    Court Reporter:              Charleane M. Heading
3                                225 Cadman Plaza East
                                 Brooklyn, New York
4                                (718) 613-2643

5
    Proceedings recorded by mechanical stenography, transcript
6   produced by computer-aided transcription.

7

8                       *     *     *     *     *

9

10           THE CLERK:  United States versus HSBC.

11           MR. SILVER:  Good morning.

12           THE COURT:  Have a seat everybody except for counsel

13   for the parties.

14           State your appearances, please.

15           MR. SILVER:  Daniel Silver, Laura Billings and Alex

16   Solomon for the government.  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MR. SILVER:  Good morning.

19           MR. SEYMOUR:  For the HSBC defendants, Samuel

20   Seymour and Alex Willscher from Sullivan & Cromwell.

21           THE COURT:  Good morning.

22           MR. MOORE:  Hubert Dean Moore and my wife Ann Marie

23   on behalf of ourselves.  Good morning.

24           THE COURT:  Good morning.  Come on over so the

25   microphone can pick you up when you begin to speak.

3

1           All right.  We are here because there is this
2   pending case against HSBC in connection with which there's a
3   deferred prosecution agreement in connection with which a
4   monitor's report was filed under seal with my permission and
5   Mr. Moore has made an application that I have construed as one
6   to unseal that report.  That's where we are here.
7           Thank you for your submissions.
8           Let me hear first from you.  You're the movant.  Is
9   there anything you want to add to your written submission,
10  Mr. Moore?
11          MR. MOORE:  Yes, there is, Your Honor.
12          Several other items since that time have come to my
13  attention.  After my rebuttal letter, additional information
14  came to me through my contacts in Europe so I believe you were
15  copied on that as well from Mr. Michael Mason-Mahon.  In
16  addition to that, there were some additional items that I know
17  that will be or should have been filed with the Court as well.
18          THE COURT:  Sorry.  Let me interrupt you for a
19  second.
20          MR. MOORE:  Yes, sir.
21          THE COURT:  I think we've already uploaded into the
22  ECF this Mason-Mahon letter.  Have we, Kayla?
23          THE LAW CLERK:  Yes.
24          THE COURT:  So you're all aware of that?
25          MR. SEYMOUR:  Yes, Your Honor.

4

1          THE COURT:  This morning, and this sort of, counsel,

2   is a favor, just decide it sooner rather than later because

3   now I'm becoming the recipient of all complaints against HSBC

4   worldwide, it seems.  I got a big stack of papers this

5   morning.  Did they come in by fax?

6          THE LAW CLERK:  Yes.

7          THE COURT:  They are from someone.  I've only

8   glanced through it.  We have it here.  Kayla will show you.

9   I'll upload the whole thing.  You can see it after we're done

10  with the argument.  It looks like it doesn't strike even a

11  glancing blow on the issue before me.  It looks like a

12  complaint about some bankruptcy order involving HSBC.

13         MR. MOORE:  The question which --

14         THE COURT:  Let me finish.  Let me finish.  I will

15  let you speak.

16         MR. MOORE:  I'm sorry.

17         THE COURT:  So it's there.  You can see it.  I'll

18  upload it.  Unless there's more to it than met my eye in the

19  two-minute glance before I came down, it is not something I

20  believe will be germane to the issue before me.

21         MR. MOORE:  Yes, sir.

22         THE COURT:  Go ahead.

23         MR. MOORE:  Yes.  The question that revolves around

24  is that the, both DOJ and Sullivan Cromwell put forth in their

25  arguments, in the rebuttal of December 11th, my letter, and I

1    sent a letter to the Court, obviously both sets of counsels

2    have them as well.

3          Their arguments I felt were lacking, especially in

4    light of -- in certain cases, there was a question from the

5    DOJ with regards to the Court's ability to adjudicate this

6    matter.  That was a question that was raised by them as far as

7    is the monitor's report a judicial document and the question I

8    believe was raised in the very first paragraph of the first

9    sentence.

10         The question that I would ask in rebuttal is that in

11   their own filings, the DOJ has, in their letter of October 1,

12   2015, answered the Court that pursuant to your order of 2013,

13   they would be filing everything accordingly and it is a

14   judicial document.  So that argument should be without merit.

15         THE COURT:  Okay.

16         MR. MOORE:  Okay.  In addition to that, the other

17   items that, to strike was that the cases they refer to, the

18   Belfort ruling which was heard in this court, the question

19   there was that you could not redact a document in total

20   because the document itself would be rendered useless,

21   however, in referring and in reading the document, the only

22   thing that's been struck is the financial piece.  The ebb and

23   flow of the case is there.

24         And they -- so the contention that striking the

25   document, redacting everything in the document would render it

6

1   useless, in this particular case, the only thing that is

2   redacted and removed are the financial terms of which have no

3   bearing in this particular case.

4           THE COURT:  You mean the victims list?

5           MR. MOORE:  No, that's a different case.  This is in

6   regards to the <u>Belfort</u> case as far as how much he would be

7   repaying to the court and when he would be paying.  The

8   schedule has been removed.  That, to me, it's of no

9   consequence and it does not render the redacted portion making

10  this basically a useless document.  Quite the opposite.  It's

11  still a very useful document and, yes, that's one of the

12  cruxes of their argument.

13          Further, the argument, and pardon me if I mess up

14  the spelling, the <u>Amodeo</u> case which was a direct monitor's

15  case, I guess the first question I would ask is Ms. Little,

16  when she turned her materials in, she met with the judge in

17  chambers specifically because it was a RICO case to protect

18  the witnesses of the case.  That was what she did not want

19  published.  That is what she took great pains to prevent their

20  illumination, shall we say, to the union under RICO statute.

21  But yet, there are quite a few other cases that were mentioned

22  within the first case that were cited by neither sets of

23  counsels which would have actually undermined their case.

24          I just find it kind of rather unique that both

25  parties quoted fundamentally the same cases, not exact, but

1    fundamentally the same and with the same arguments.

2         And subsequent to that, the logic being employed is

3    something to the effect of, in algebra, we call it circular

4    logic.  They make a statement.  HSBC, as admitted by counsel

5    or as interviewed by counsel, has stated in the statement of

6    facts their client was in violation of the law.  The next

7    statement that they make, this is in my letter, I believe, of

8    November 13th, the next statement that they make is the

9    monitor's report cannot be unsealed because it will show other

10   people how to break the same laws that they said they were

11   going to fix.

12        Counsel, just as a side note, has said I had roughly

13   30 days from the time that the PACER filings were made to be

14   publicized.  I was not aware, and I do searching quite a bit

15   of time for my job, I did not even see the PACER file until it

16   was pointed out to me by a reporter, did you know this was out

17   there, so I had to go and physically see it.

18        So, when counsel for HSBC makes the argument it's an

19   extremely small population and, therefore, should not be

20   considered loses a little bit of wind when you figure -- when

21   you talk to PACER in general, there are roughly 1 million

22   numbers in PACER.  That includes individuals, firms or jointly

23   within PACER.  The last U.S. census, I believe, was

24   330 million just in the U.S. alone.  So for counsel to contend

25   that the totality of the U.S. saw this would be a

8

1   misstatement.

2          In addition to that, in the case for, in the Amodeo

3   case, it was specifically set up, the monitor kept the names

4   private because they were informants.  Now, if I'm unaware or

5   if I have not seen anything from DOJ that they were intending

6   to file a RICO charge against Sullivan Cromwell's clients, I

7   don't see how that case would have bearing because what was

8   redacted was for physical protection of the witnesses.

9          And, finally, the other question would be, and I --

10  do I address you?  Do I address counsel?

11          THE COURT:  No, you address me.

12          MR. MOORE:  Very good, sir.

13          My question would be, is based on some of the

14  materials that have come out within the last year, one of the

15  questions would be is Sullivan & Cromwell, as they are acting

16  as HSBC's attorney and as their agent in this particular case,

17  are they aware of any wrongdoing on behalf of their client

18  that would abrogate the deferred prosecution agreement both in

19  the U.S. and internationally?

20          The reason I'm asking that question, Your Honor, is

21  that there are -- since the DPA was signed, there have been

22  situations in India as well as in China, Hong Kong

23  specifically, where false documents were filed in a court

24  leading to erroneous and then overturned items.

25          THE COURT:  All right.  Let's keep our focus on what

1    is before me now.

2              MR. MOORE:  That's fine, sir.

3              THE COURT:  Which is the right of access, if there

4    is one, to this report.

5              MR. MOORE:  Yes, sir.

6              THE COURT:  And why don't I hear from your

7    adversaries.

8              MR. MOORE:  Thank you, sir.

9              THE COURT:  Who wants to be heard first?

10             MR. SILVER:  I can go first, Judge.

11             THE COURT:  Go ahead, Mr. Silver.

12             MR. SILVER:  Your Honor, our argument can be thought

13   of in three prongs essentially.

14             There's prong one which is that the report is not a

15   judicial document to which the presumption of access applies.

16             Point two is that even if the Court concludes that

17   it is, and we obviously think it is and then, therefore, the

18   inquiry stops there, if Your Honor disagrees with us, point

19   two is that the harms we've identified, the countervailing

20   interests, justify sealing anyway.

21             I think point three is, sort of assuming Your Honor

22   gets that far, is whether the issues that Mr. Moore raises

23   sort of affect those countervailing interests in such a way as

24   to justify unsealing.

25             If Your Honor would give me a little leeway, I would

1  like to speak a bit about prong two.

2      THE COURT:  Sure.

3      MR. SILVER:  As I said, I think the Court doesn't

4  even need to get there because I really do think that this is

5  not a judicial document to which the presumption applies

6  anyway, but I want to say a few things about prong two because

7  that's sort of the factual issue that can most benefit from

8  further elucidation.

9          So, you know, let me just say to be clear that the

10  government, the harms that we discuss, that we think will flow

11  from unsealing of this report are not put forth in an effort

12  to protect HSBC.  That's really not the government's interest

13  here at all.  That's obviously Mr. Seymour's job.  Our

14  interest is to ensure that a monitorship succeeds and that the

15  goals of the DPA are satisfied.  And we truly believe having

16  worked on this monitorship for now two and a half years and

17  dealt with regulators around the world who are also integrally

18  involved in the monitorship, that making this report public

19  will substantially undermine the effort that is underway and

20  the purposes and goals of the DPA.  And, you know, we identify

21  several reasons for that and the one that I think is most

22  salient in my mind and perhaps most relevant for now is the

23  global nature of this undertaking.

24          You know, this DPA was somewhat unprecedented in the

25  sense that, you know, the monitor works not just for DOJ, but

1    also for the Federal Reserve and for the FCA in the UK and,

2    furthermore, unprecedented in the sense that it's truly a

3    global monitorship and the monitor, to do his job and to

4    ensure that the DPA's goals are met, must interact and comply

5    with foreign regulators in more than 60 jurisdictions around

6    the globe.  To do that, he must give and be able to give

7    certain assurances regarding the confidentiality of the

8    information that he gets from those jurisdictions.  And so,

9    therefore, to unseal this document would really --

10             THE COURT:  Could you just unpack that a little bit?

11             MR. SILVER:  Sure.

12             THE COURT:  Why is that so essential?

13             MR. SILVER:  Because the monitor, to inform the

14   government of the progress that the bank is making to remedy

15   the AML problems and sanctions problems that we identified in

16   the DPA, he must have access to information in all the

17   jurisdictions around the world that would otherwise be

18   protected from disclosure to any third parties including the

19   monitor or even the DOJ by those domestic jurisdictions' bank

20   secrecy requirements.  So that's essentially the issue.

21             So, to get access to the information in these

22   jurisdictions, he must get the consent, in most cases, of the

23   local regulator and it would make it very, very difficult to

24   get that consent if he had to say, well, you know, this

25   information may wind up in a public court filing in the U.S.

1    at some future point.

2          THE COURT:  So they are willing to cooperate with

3    the monitor and the entities the monitor acts on behalf of

4    only if the particular information they provide remains

5    confidential or the fact that they've provided it remains

6    confidential?

7          MR. SILVER:  The particular information.

8          THE COURT:  So, one problem I have with the argument

9    is if credited, and my inclination is to credit it -- I'm kind

10   of at an information disadvantage here but I have these other

11   concerns that I have expressed.  I'm sure we're in complete

12   agreement as to whether I properly had those concerns but I

13   have them.

14         I don't understand why, given the concerns I think

15   need to be addressed, why a more targeted redaction of

16   information as opposed to a sealing of this entire report

17   isn't appropriate.  You can easily camouflage which foreign

18   regulators provided which, that stuff can be dealt with in a

19   less restrictive manner than complete sealing.

20         MR. SILVER:  Well, let me give a couple responses to

21   that.

22         Number one, and let me just clarify again, it's not

23   so much which foreign regulators are involved or which foreign

24   jurisdictions are involved.  It's the actual substantive

25   information from those jurisdictions.  So that sort of makes

1   it a little more difficult.  It's not just sort of hiding --

2          THE COURT:  Let me interrupt you just to acquaint

3   you more precisely by example with my concerns so you can

4   address them.

5          Do you have the report here?

6          MR. SILVER:  I do.

7          THE COURT:  And just by way of a backdrop to this

8   question, I know you disagreed with this at the time I said it

9   but I said it and I meant it in my prior opinion.

10         I said I don't intend to catalog all the possible

11  situations that might implicate the Court's supervisory power.

12  I'm skipping a little.  What I can say with certainty is that

13  by placing the DPA on the Court's radar screen in the form of

14  a pending criminal matter, the parties have submitted to far

15  more judicial authority than they claim exists.

16         If you turn to page 28 of your report --

17         MR. SILVER:  This is of the monitor's report?

18         THE COURT:  Yes, of the monitor's report.  This is

19  under seal so why don't you -- if I were you, I would be

20  looking over his shoulder.

21         MRS. MOORE:  I am actually reading it.

22         THE COURT:  Page 28 and following for a few pages.

23  It strikes me as the sort of information -- you know, you put

24  me in this position.  I didn't invite you guys in here.  You

25  filed this criminal case.  That strikes me as the sort of

1   thing, the essence of that is what you've put me in, you put

2   me in a position where it seems to me, in the exercise of the

3   authority I think I have a responsibility to exercise, I need

4   to know stuff like this and I can't for the life of me figure

5   out why the sun shouldn't shine -- particulars might be

6   redacted, but this stuff has happened in connection with this

7   really oppressive monitor's report and I'm having trouble

8   figuring out why that should remain secret.

9              MR. SILVER:  Well, I mean, I think --

10             THE COURT:  And the cognizable harm.  You know, I

11   can understand why HSBC and the government might not want this

12   to be public, but I'm not with you on that.  I think it ought

13   to be and the interests that you have described do not strike

14   me as being harmed by, just as an example, by the unsealing of

15   that information.

16             MR. SILVER:  Well, I think, you know, your question

17   touches on a few different issues at play here so let me try

18   to cover them.

19              I mean, first, let me say that if Your Honor, having

20   reviewed this document, believes that there are, that the

21   government didn't do a sufficient job of summarizing the key

22   components of it in the report we filed I think back in April,

23   then that, I understand that criticism and we can certainly go

24   forward, you know, essentially -- if that's Your Honor's

25   concern, you know, we can make an effort going forward in our

1   quarterly reports or the reports that follow the issuance of

2   these substantive reports, you know, do a better job of

3   cataloguing each and every criticism or unfulfilled mandate,

4   so to speak, that the monitor has raised.

5           I'm not sure that ultimately Your Honor would

6   benefit from that, but that is something that we can certainly

7   do, that it's sort of separate from the relief that is being

8   sought here.

9           THE COURT:  Understood.  And let's assume -- and

10  you're not waiving your argument by addressing this concern.

11  Assume that I think this is a judicial document, and I will

12  consider this alternative suggestion you've just made, that

13  one way to ameliorate this problem is to have a more fulsome

14  summary, but assume that away for a moment.  Assume this is a

15  judicial document.  How does the public disclosure of that

16  information, for example, and lots of the other information in

17  here impair the interests that you are concerned about?

18          MR. SILVER:  Because, I think going back to the

19  issue regarding foreign regulators, there's sort of two main

20  points.

21          One is that, you know, what the monitor is doing,

22  among other things, is synthesizing and collating information

23  he gets from jurisdictions around the world to suss out sort

24  of what are the sort of key themes in terms of what the bank

25  has done, has not yet done, is trying to do, has failed to do,

1  needs to do.  Right?  And so in doing so, he collates and

2  synthesizes this information from all of these jurisdictions

3  and tries to present it to us, the government, in a, you know,

4  in a, in full, in full detail and also sort of mixing and

5  matching information from around the world, essentially, to do

6  just that, to tell us in as much detail as he can what's going

7  on.

8          So, it's extremely difficult.  It's not just sort of

9  an issue of, well, let's cut this chapter and save that

10 chapter to protect certain regulators' concerns.  We would

11 really have to gut and disaggregate the whole thing to, even

12 just to redact the information from foreign jurisdictions

13 because it's replete throughout the document.

14         Let me just make one other point which is sort of

15 separate from that which is that if, if that were the

16 undertaking, putting aside the disaggregation issue --

17         THE COURT:  Let me stop you there.

18         MR. SILVER:  Yes.

19         THE COURT:  What do you mean by that?  Just suppose

20 I accept your, and I'm inclined to, accept the legitimacy of

21 your concern about the cooperation of foreign regulators.  By

22 example, pages 28, 29, what if I just struck the country

23 names?  I don't understand the disaggregation part.

24         MR. SILVER:  Well, that kind of leads directly to

25 point two which is that whatever remedy sort of the Court

1    imposes here, right, with respect to redactions or whatever

2    plan, not even if Your Honor imposes it, whatever DOJ comes up

3    with, is going to be sort of post hoc.  Right?

4         So, when the monitor is next in jurisdiction X and

5    jurisdiction X says what's going to happen to this

6    information, you know, I don't -- A, you know, I'm a foreign

7    regulator, I barely understand, I don't understand what a

8    monitorship is supposed to do, never heard of such a thing, I

9    don't understand how a court in the U.S. has oversight over

10   what I do in my country anyway and now you're telling me that,

11   you know, you'll try to protect our information in some

12   fashion but it's going to be subject to some sort of process

13   down the road and you can't really explain to me what that

14   process will look like.  The answer is going to be pound sand.

15        THE COURT:  What?  Really?

16        MR. SILVER:  Yes.

17        THE COURT:  It's okay if you tell Dan Silver all

18   this stuff but tell Hubert Moore, I'll clam up.  I don't

19   understand that.  You're the prosecutor.

20        MR. SILVER:  The reason that sort of I raised this

21   issue first, Your Honor, is exactly the issue that perhaps

22   would not, would not strike you as being real, but it is.  It

23   really, really is.  I mean, that's how -- I'm sort of trying

24   to convey our experience in supervising this monitorship and,

25   you know, the hurdles that we've encountered around the world.

1   And while I understand your skepticism, frankly, that, gee,

2   why does a foreign regulator care about the issue that I just

3   described, they do.

4          THE COURT:  Okay.

5          MR. SILVER:  And they have the power to really

6   hinder this, this project.

7          THE COURT:  So let's assume it's real.  Just because

8   it is real doesn't mean it's an interest that ought to be

9   vindicated by continuing the sealing of this.  There's other

10  ways we can deal with it.

11         MR. SILVER:  Well, I think the problem is -- I don't

12  think there's other ways to deal with it that really let the

13  monitor do his job and still let us get the information we

14  need.

15         THE COURT:  You could have done a non-prosecution

16  agreement and that would be out of your hair.

17         MR. SILVER:  Then I think we're going back to maybe

18  prong one, right, which is what purpose does this document

19  have now in the proceeding before Your Honor which is sort of

20  separate from the strength of the countervailing concerns.

21         THE COURT:  I think it's integral to your plea

22  agreement, to your DPA, I think this document is.

23         MR. SILVER:  Can I try to convince you otherwise?

24         THE COURT:  I don't think it's anything but a

25  judicial document.  This is not exactly a common situation,

1    but the analogy to other cases that address what's a judicial

2    document and what's not I think is pretty strong in favor of

3    this being a judicial document.  It lies at the heart of this

4    disposition that you've put on my docket.

5              MR. SILVER:  Let me very briefly try to -- it sounds

6    like Your Honor has determined this issue.

7              THE COURT:  Well, it's an oral argument and I am

8    sharing with you my concerns so you can address it.

9              MR. SILVER:  Okay.  I think to put it as concisely

10   as possible, let me say a couple of things about the judicial

11   documents issue.

12             Number one, when Your Honor -- and as Your Honor

13   alluded to, there's a difference of opinion, so to speak, at

14   the outset regarding the extent of the Court's authority, but

15   where we maintain our position but we're not trying to

16   relitigate that issue, we are here working under the law of

17   the case and Your Honor's opinion regarding your authority.

18   So --

19             THE COURT:  There's no decision in that <u>Fokker</u>

20   appeal yet, right?

21             MR. SILVER:  I believe that's correct.

22             THE COURT:  The DC circuit case.

23             MR. SILVER:  Yes.

24             So, but my point is this, that under the regime that

25   Your Honor has structured or has found to be the extent of

1   your authority, as Your Honor said in your opinion back in

2   2013, it is a fairly limited authority to approve or reject

3   the DPA -- these are my words, not yours -- essentially, it

4   offends the sensibility of the Court, if there were

5   improprieties was the word you used, or illegality or

6   conflicts of interest regarding the terms or the genesis of

7   the DPA, and you said that they very clearly were not and that

8   decision was reached.

9           So, this document to us is relevant to the

10  government's determination, ongoing duty to monitor compliance

11  with the DPA and determine whether or not to hold the bank in

12  breach and to initiate charges which are sort of core

13  prosecutorial actions and that is the purpose of this document

14  and that's the basis, the primary basis for an argument that

15  it is not a judicial document in the sense that the sealing

16  doctrine applies.

17          So I, you know, we take issue with --

18          THE COURT:  I understand, and there's really only so

19  far as we can go with this because I understand your position.

20  It is the law of the case, but to make a point by

21  exaggeration, I take it it's your position that if the

22  monitor's report said everywhere we went, just hypothetically,

23  everywhere we went, they manufactured documents to us and

24  defrauded us, the monitor, into believing that they were

25  complying with the obligations of the DPA, committing

1    obstructions of justice, and notwithstanding all of that, you

2    went along and the case got dismissed pursuant to the terms of

3    the agreement in five years, I think it's your position that

4    even then, I don't have the authority, let alone the

5    discretion, to reveal to the public the fact that that

6    happened.  Right?

7              MR. SILVER:  Well, first, let me just say that I

8    think, I want the record to be clear that I think what you're

9    posing as a hypothetical is counterfactual.  I don't think

10   that that's --

11             THE COURT:  I said it was a hypothetical.

12             MR. SILVER:  Okay.

13             THE COURT:  I'm trying to make a point by

14   exaggeration.  We're kind of at loggerheads because you

15   disagree with the scope of my authority.

16             MR. SILVER:  Well, we do disagree.  You know, we

17   disagreed at the outset and I think that, I think that as

18   you've construed your authority, the scope of your authority

19   now is to determine I would say essentially if we're acting in

20   good faith, we, the government, are acting in good faith and

21   certainly not violating any other legal duties or principles

22   or rights of the defendant or other relevant parties.  So, I

23   do view that as different, I think, from what you described.

24             THE COURT:  Okay.  Got it.

25             MR. SEYMOUR:  May I be heard, Your Honor?

1          THE COURT:  Of course.  Let me make sure your

2     colleague over here doesn't have more to say at this juncture.

3          MR. SILVER:  I guess I would very briefly say with

4     respect to the issue, to Mr. Moore's application which is what

5     brought us here in the first place, I want to make it clear

6     the government is, you know, sympathetic to Mr. Moore's

7     concerns as we understand them and, frankly, I think it's

8     laudable that he as a private citizen has, you know, made a

9     personal sacrifice to get himself involved in a complex issue

10    like this but, nonetheless, I think that the issues he raises

11    as essentially a private litigant who's involved in a dispute

12    with HSBC are really not relevant to the strength of the

13    harms, the countervailing interests that would flow from the

14    unsealing of this document.

15         Let me just also say, by the way, as we've said in

16    our papers, I think, frankly, Mr. Moore is mistaken, that this

17    report has absolutely no bearing on his private dispute with

18    HSBC, but even if it did, and this is another counterfactual

19    hypothetical, that would not be a proper basis to affect the

20    balance of these interests.

21         THE COURT:  Thank you.

22         Mr. Seymour?

23         MR. SEYMOUR:  Thank you, Your Honor.

24         I want to come back to the question of the harms

25    that might be caused by 20-A of the report, but before that,

1    you referred to the cases that apply and there's a very well

2    developed body of law that governs this question of the

3    potential unsealing of this document and I'd like to spend

4    just a moment on the Erie case.

5              THE COURT:  Yes, go ahead.

6              MR. SEYMOUR:   The Erie case which is the most recent

7    Second Circuit case where a monitor's report in connection

8    with a case, you know, was attempted to be sealed and the

9    Second Circuit, the panel on the Second Circuit ruled that it

10   should be released, and I believe that case is our very best

11   argument because the differences in the role of the court in

12   that case and the nature of the dispute in that case are an

13   actual road map to why we believe that same panel would come

14   out 180 degrees different if they looked at this case.  It

15   really does go back to where we started this discussion over

16   two years ago which is the role of the court.

17              As you've been discussing, we don't have to guess at

18   the role that Your Honor plays in this case.  There's a

19   decision laying it out.  You talked about your role in

20   reviewing and approving or not the case that's decided.  That

21   had nothing do with the monitor's report.  It wasn't even

22   written at that point.  Now we're in the supervisory part and

23   your supervisory authority, as you described it in the order,

24   it's limited to making sure the implementation of the deferred

25   prosecution agreement is done within the bounds of lawfulness

1    and with respect to the integrity of the court.  And with

2    respect, that is a rather limited authority.  It is not

3    adjudicative.  All right?

4         If you take the Erie case and if you go back to

5    basics and look at the settlement in that case, there is a

6    consent degree.  It was filed publicly.  I have a copy of it

7    here.  It requires the monitor to submit the reports to the

8    court and then the court, armed with that report, has plenary

9    authority to adjudicate, that is, to decide whether to declare

10   a breach, whether to bring some sanctions, decide the case,

11   and with respect, that is a completely different role than the

12   Court has here.

13        Therefore, if you get back to what does public

14   access mean, what is the purpose of it, the cases are very

15   clear.  The public has a right to, in effect, monitor you, to

16   watch the courts, is the court doing what they're supposed to

17   do in a particular case.

18        That makes sense in Erie.  The court is receiving a

19   report and deciding whether to do something with it.  The

20   public should see the report and decide whether the court is

21   making a good judgment.  The court went on to say not only

22   that, but the nature of that dispute was about a public

23   facility, the Erie County jails, funded by the public, run by

24   the public for the benefit of the public, a very, very

25   different case than here.  All of that added up to the release

1    of the report.

2            Here, the public has no right to watch your

3    adjudication around the report because that's not your role.

4    That's not the role that you've set up for yourself.  So in

5    that spectrum, that continuum that you've written about in the

6    Belfort case about the weight of the presumption that applies,

7    assuming it is a judicial document, you still have to go to

8    that continuum.  We would argue that it's at the periphery,

9    the lightest imaginable presumption which really drives the

10   analysis that you go through.

11           Once you have a light presumption, you still get to

12   the weighing of harms that Mr. Silver has been talking about

13   and we certainly agree that it's not about whether you can

14   redact the name of a country out of a couple of pages of this

15   report, this really has to do with a dynamic of the

16   monitorship.

17           The monitor is continuing to do his work now and as

18   you saw in the letter from the DOJ at the last go around,

19   there were six countries visited in the last report.  Now, I

20   don't know if it's six again in this coming year, but over a

21   five-year period, if it's six countries per year, that is a

22   very, very substantial part of the operation of HSBC, very

23   substantial part of the operations of the monitorship.

24           It has to be a great concern when those regulators

25   are told, by the way, last time we told you you had full

1    confidentiality of whatever you tell the monitor, it's going

2    to go into a report but it would not be made public, this time

3    they would have to be told, well, it will be partially public.

4    They will say, well, who gets to decide that, me?  No, you

5    don't, Somebody else does.

6            We believe, the DOJ believes and I believe the

7    monitor accepts that those regulators would pull back their

8    cooperation.  That means the monitorship doesn't work and

9    that's a bad thing.

10           THE COURT:  What did he mean when he said that he

11   believed a redacted report could be produced that doesn't

12   negatively impact his work?

13           MR. SEYMOUR:  He goes on, of course, to say, but I

14   believe there's a high risk it will be unintelligible and

15   useless.

16           THE COURT:  Well, so, what did he mean by that?

17           MR. SEYMOUR:  Obviously he can speak to that.  Our

18   view is that --

19           THE COURT:  But it seems to be intentioned with the

20   argument made.

21           MR. SEYMOUR:  I don't think it is because I think he

22   and we are speculating about the reaction of regulators, but

23   he feels very strongly that without an assurance of

24   confidentiality, they're not going to give the same level of

25   cooperation.  He had the same view about the employees of

1  HSBC, we certainly view it the same way, when they're told, by

2  the way, what you tell the monitor may or may not end up in a

3  public document.  I mean, that's the harm.

4          When you go through the analysis and you consider

5  that this is entitled to a low presumption under the continuum

6  analysis and the weighing of harms which traditionally is a

7  matter of privacy, right, or law enforcement techniques, this

8  is a different case.  This is a new, first time consideration.

9  It goes to the operation of the monitorship, is it going to

10  work or is it going to be negatively effected.  Where we're

11  talking about a very light interest of the public in watching

12  you do your job and the very powerful interest of having this

13  monitorship work, I think the balance tips in favor of keeping

14  it under seal, not running the risk.  We don't know, I don't

15  think Mr. Cherkasky knows, no one knows what the effect would

16  be.  What we do know is it's working now.

17          We submit to you that the role you have set up for

18  yourself of supervision is satisfied by the quarterly letters

19  you get.  The public knows there's a monitor, knows that it's

20  going forward and knows at least at some level of detail how

21  it's going because they can read the quarterly letters.  What

22  lies underneath that is, we submit, equivalent to the names

23  and addresses of Mr. Belfort's victims.  It's something you

24  have, it's something you wanted, you find it relevant or

25  useful, but that doesn't mean the public needs to see it.

1  That's not part of the materials needed to judge and monitor

2  the operation of the Court.

3             THE COURT:  All right.

4             MR. MOORE:  May I counteract, Your Honor?

5             THE COURT:  Not yet.  In a minute.

6             MR. MOORE:  All right.

7             THE COURT:  Another interest set forth in your

8  submissions is that if there's unsealing of this monitor's

9  report, it will be a road map for others to commit money

10 laundering violations.

11            Again, why can't that be ameliorated, to the extent

12 it's true, why is it true and to the extent it is true, why

13 can't it be ameliorated by redactions?

14            MR. SILVER:  Well, it's true because, you know, a

15 significant part of the monitor's job, right, is to identify

16 areas in which the bank's controls can be improved.

17            I mean, it is important -- let me just back up for a

18 second because I think there's a little bit of, I don't think

19 it's necessarily Your Honor's misconception, but I think

20 there's been misconception which may inform Mr. Moore's

21 application about what's the heart of this.

22            The heart of this is not intentional wrongdoing by

23 the bank.  It's a lack of sufficient controls by the bank.

24 And so the monitor's job is to determine where controls are

25 still insufficient and where they can be improved.  And so --

1          THE COURT:  What do you mean, it's not intentional?

2     What's not intentional what I'm doing about the bank?  What

3     are you referring to?

4          MR. SILVER:  Well, that's the nature of the case,

5     right?  It's not a money laundering case.  It's an anti-money

6     laundering case.  That's what I meant to say, right?  So the

7     bank was not charged with money laundering.  The DPA is not

8     about money laundering.  It's about lack of sufficient

9     controls to prevent money laundering by third parties.  I

10    think it's an important distinction that the public has missed

11    at times.

12          So, to get back to your question, the monitor's job

13    is to make sure the bank is improving those controls, right,

14    to make sure that the weaknesses in their systems to detect

15    and prevent financial crime by third parties using the bank's,

16    the bank's processes are being addressed.

17          And so that, that is, you know -- one of the key

18    components of the monitor's job is to identify those

19    weaknesses.  So that's why those weaknesses have to be put in

20    the report and they're not necessarily going to be, you know,

21    right, something that a certain bank executive did on purpose.

22    They're going to be problems with the systems that the bank is

23    currently employing to detect and prevent financial crime.

24          So, why could that be useful to criminals?  Well,

25    obviously because that would be good to know.  Is it likely

1    that a drug dealer on the streets of Brooklyn is going to read

2    this report and modify his or her activities?  Maybe but

3    probably not, but more sophisticated actors around the world

4    who work in the financial world certainly could and so that's,

5    that's the basis for our concern.

6              THE COURT:  Okay.  And why can't redactions about

7    specific weaknesses and specific components of the bank do the

8    trick in terms of obliterating the road map?

9              MR. SILVER:  Well, because you would essentially be

10   redacting the core of the document.  I mean, that's what --

11   you know, if there's one thing that the document is supposed

12   to do, it's supposed to tell the government where the bank has

13   not yet completed its mission and so, you know, in a sense,

14   you were redacting what could be the most important part of

15   the document's work.

16             THE COURT:  Maybe that's what Mr. Cherkasky meant,

17   maybe that's the price Mr. Moore has to pay, but it doesn't

18   counsel in favor of complete sealing to me.

19             MR. SILVER:  Well, I mean, it's one, it's one of our

20   several arguments as to why complete sealing is appropriate.

21   And I think, you know, as we were discussing at the outset, if

22   Your Honor's concern is that the public is insufficiently

23   informed about the progress of the DPA, which I don't think is

24   valid, but if that's the criticism, then perhaps the answer is

25   not to publicly file this document but to tweak the nature in

1  which we report to Your Honor about the progress.

2          MR. SEYMOUR:  May I, Your Honor?

3          THE COURT:  Yes.

4          MR. SEYMOUR:  I think on the redaction issue, the

5  Amodeo cases are very instructive.  Judge Patterson tried to

6  redact the monitor's report.  It got appealed.  It got

7  discussed in great length in Amodeo I and it got remanded.  He

8  considered it again.  He sealed part of it and redacted part

9  of it.  It got appealed up.  It got sent back and they told

10  him it's all or nothing.  At the end, if you look after the

11  remand, he sealed the whole thing.

12          So, after two trips to the Second Circuit and a lot

13  of attempts at redaction, each one of which made it

14  incomprehensible, unintelligible, and a lot of time was

15  wasted, the report was maintained under seal.  I don't think

16  we should go down that road.

17          MR. MOORE:  Your Honor?

18          THE COURT:  Just a second, Mr. Moore.

19          Yes, go ahead.

20          MR. MOORE:  In light of what counsel just said, the

21  reason there are two major issues with counsel's argument, the

22  first one, the Amodeos, the orders that were filed with the

23  clerk by Ms. Little, the monitor, were done outside of her

24  judiciary responsibility.  She did them in private, in camera,

25  to prevent the disclosure of witnesses in a RICO trial for

1  fear of their health and safety.  Eventually that was deemed

2  that we will seal everything to protect individuals.  Don't

3  mess with DOJ, unbeknownst to anything in the press, we just

4  filed a RICO case.  I don't see that has any bearing.

5          Now, the other question by the gentlemen from the

6  DOJ.  We're talking about the controls and that really gets to

7  the heart, that really gets to the heart of one of the issues

8  that I raised is the entire concept of their internal controls

9  to the point that even in the annual report of last year,

10  actually, the most current annual report of 2014, the

11  executive committee of HSBC put in their internal control

12  definition and procedure that they will review any changes

13  specifically regarding to regulatory investigations, fines,

14  sanctions, et cetera, as it relate to the conduct of business

15  that would negatively affect our results or brand.  Nothing

16  about doing it right.  Just about how much money will we have

17  to pay.  That's in their financial reports.

18          THE COURT:  Thank you.  Thank you all.

19          I'm going to take the motion under advisement.

20          MR. SILVER:  Thank you.

21          MRS. MOORE:  Thank you.

22          MR. SEYMOUR:  Thank you.

23          THE COURT:  Kayla has a copy of that missive about

24  some bankruptcy order which you can take a look at it.  We

25  will upload it.

1          MR. MOORE:  That's fine.

2          THE COURT:  It's not something you really need to

3    spend time with for the moment, but if you want to, it's right

4    there.  Just give it back to Kayla.

5          Thank you.  Have a good day.

6          (Matter concluded.)

7

8

9                    *    *    *    *    *

10

11   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

12

13   /s/ Charleane M. Heading            January 16, 2016
     _____         _____
14   CHARLEANE M. HEADING                     DATE

15

16

17

18

19

20

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR